IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHRIS SMITH, | ) | Case No. 1:20-cv-1366 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Chris Smith, seeks judicial review of the final decision of the Commissioner of Social Security, denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Smith's applications for DIB and SSI be AFFIRMED.

I.    **Procedural History**

On February 28, 2018, Smith applied for DIB and SSI.  (Tr. 239-51).  Smith alleged that he became disabled on July 13, 2017, due to: "1. ambulation of the left and 2 on the right[1]; [and] 2. back."  (Tr. 284).  The Social Security Administration denied Smith's applications

---

[1] It's not entirely clear what this means.  Based on the record, Smith probably meant to reference his toe *amputations*.

initially and upon reconsideration.  (Tr. 69-153).  Smith requested an ALJ hearing.  (Tr. 186-87).

ALJ Joseph Hajjar heard Smith's case on May 22, 2019, and denied the claims in a June 25,

2019, decision.  (Tr. 9-68).  On April 20, 2020, the Appeals Council denied further review,

rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6).  And, on June

22, 2020, Smith filed a complaint to obtain judicial review.  ECF Doc. 1.

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Smith was born on October 17, 1955, and he was 61 years old on the alleged onset date.

(Tr. 239, 246).  Smith had a high school education and completed two years of college in 1989.

(Tr. 37, 285).  Smith had past relevant work as: (1) an automobile detailer (unskilled, light work

as performed); (2) a dishwasher or kitchen helper (unskilled, light work as performed);

(3) machine operator or production machine tender (semi-skilled, light work as performed); and

(4) a residential monitor or receptionist/hospital admitting clerk (semi-skilled, sedentary work as

performed).  (Tr. 39-43, 56-59, 274, 385).

### B.    Relevant Medical Evidence

#### 1.    Physical Health Records

On November 30, 2015, Smith told Carla O'Day, MD, that he was out of his heart

medication and needed a new prescription, or his cocaine addiction treatment facility would not

accept him.  (Tr. 652).  Examination showed that Smith appeared well and had a regular heart

rate and rhythm, full range of motion in his extremities, and a normal gait.  (Tr. 653-54).

On January 14, 2016, Smith told Dr. O'Day that he'd had headaches for four days, had

them off-and-on for years, and that ibuprofen normally helped but hadn't that day.  (Tr. 647).

Smith also said that he'd been clean from IV drugs for 90 days and was enrolled in a detox

program.  (Tr. 647).  Smith denied any extremity, leg, or back pain.  (Tr. 648).  Examination

showed normal appearance, full range of motion, and intact sensation.  (Tr. 649).

On January 17, 2016, Smith told Leo Moysaenko, MD, that he had a history of

headaches, but he did not take the pain medications that were prescribed to him because he was a

recovering drug addict.  (Tr. 642).  Smith denied having any extremity pain, back pain, joint

pain, or difficulty walking.  (Tr. 643).  Examination showed that he was able to move all his

extremities and had normal extremities, full range of motion, intact sensation, intact motor

function, and a normal gait.  (Tr. 644-45).

On March 30, 2016, Smith told Ewald Kundtz, MD, that he had stopped smoking and

using drugs and was taking care of himself, but he had continued having chest tightness that

reminded him of a previous heart attack.  (Tr. 636).  Examination showed that he was able to

move all his extremities and had normal extremities, full range of motion, intact sensation, intact

motor function, and a normal gait.  (Tr. 637-38).

On June 29, 2017, Smith told Mariam Diab, MD, and Melissa Guardo, RN, that he had

chest pain after having done a "1/2 tab of oxy on Tues[day] & smoked crack on Mon[day]."

(Tr. 364).  On examination, Dr. Diab and nurse Guardo noted that Smith ambulated without an

assistive device, had no pain (other than his reported chest pain), had a low risk to falling, had

normal range of motion, had a normal gait, had no evidence of joint erythema or tenderness, and

appeared to have well-developed muscles without evidence of atrophy.  (Tr. 364, 371, 631).

Smith was admitted to the hospital for further evaluation.  (Tr. 374).  At admission, Mona Reed,

MD, noted that Smith denied having any upper or lower extremity pain, and he had full range of

motion in his extremities.  (Tr. 377-78).  Dr. Reed also noted that Smith had bilateral toes

amputated in the past.  (Tr. 378).  At discharge on June 30, 2017, Smith had intact motor

function and denied having any back, joint, or chest pain.  (Tr. 381, 386).

At a follow-up on July 2, 2017, Smith told Dr. Reed, that he had no specific complaints.

(Tr. 383).  Dr. Reed noted that Smith had normal mental status, normal mood, and cooperative

behavior on examination.  (Tr. 384).  Dr. Reed advised Smith to stop using cocaine.  (Tr. 385).

On August 17, 2017, Smith went to the emergency department because he had groin pain

and a rash on his ankle.  (Tr. 396).  On examination, Jennifer Li, MD, noted that Smith had

5/5 strength in his upper and lower extremities, intact sensation, good tone in all extremities,

intact neurovascular function, and appropriate mood and affect.  (Tr. 397).  Dr. Li also noted that

Smith's toe amputation sites were clean, dry, and intact.  (Tr. 397).

On September 2, 2017, Smith went to Allied Health & Chiropractic for groin pain.

(Tr. 410-12).  Smith said that his pain started while he was detailing a car on July 15, 2017.

(Tr. 412).  Examination showed that Smith had 5/5 strength in his upper and lower extremities

and normal ambulation.  (Tr. 410-11).  Kimberly Dahodwala, CNP, determined that Smith had a

hernia and referred him for a surgical consult.  (Tr. 411).  At follow-ups on December 1 and 29,

2017; January 26, 2018;  February 28, 2018; April 18, 2018, May 16, 2018, and June 3, 2018;

Smith reported that his groin pain affected his ability to exercise, do housework, bend, lift/carry,

and push/pull.  (Tr. 402-08, 614-21).  And examinations showed that Smith was cooperative, did

not have any noted range of motion issues, and had normal ambulation.  (Tr. 402-09, 614-21).

Smith's treatment providers consistently restricted him to "light duty" as a result of his pain.

(Tr. 402-09, 614-21).

On April 5, 2018, Smith saw Dr Kundtz for a headache.  (Tr. 568).  Smith denied having

difficulty walking and examination showed normal appearance and gait.  (Tr. 569-70).

4

On April 27, 2018, Smith saw Dominic Bayneswroth, MD, for chest pain.  (Tr. 561).
Smith denied having any extremity pain, back pain, joint pain, or difficulty walking.  (Tr. 563).
And on examination Smith had full range of motion, intact sensation, and a normal gait.
(Tr. 564).

On April 28, 2018, Dr. Reed noted that Smith was cooperative, had normal mental status,
denied musculoskeletal pain, and denied weakness.  (Tr. 575-76).

From May 3, 2018, through February 11, 2019, Smith received treatment for headaches
and neck pain from Allied Health & Chiropractic.  (Tr. 608-13, 702-11).  Smith regularly
reported that his headaches and neck pain were better with sleep and Aleve.  (Tr. 608-13, 702-
11).  Throughout his treatment, Smith reported pain and weakness, and he said that his symptoms
affected his ability to exercise, do housework, lift/carry, push/pull, and perform above-shoulder
activities.  (Tr. 608-13, 702-11).  On August 15, 2018; November 8, 2018; and February 11,
2019, Smith's providers noted that his ambulation was "slow."  (Tr. 702-05, 708-09).  Smith's
providers regularly noted that he was cleared for "full" work with respect to his headaches and
neck pain.  (Tr. 608-13, 702-11).

On August 21, 2018, Smith saw Michael Canales, DPM, for treatment of phantom pain in
his feet after he'd had multiple toes amputated due to frostbite.  (Tr. 683).  Smith indicated that
he had some pain relief from an injection at his previous visit.  (Tr. 683).  On examination, Smith
had sharp shooting pains to the distal digits with percussion of the nerves.  (Tr. 683).  He had full
strength in his extremities and full ankle range of motion.  (Tr. 683).  At a follow-up on October
23, 2018, Smith told Dr. Canales that he'd obtained custom orthotics that greatly relieved his
foot pain and he would be purchasing new shoes to better accommodate them.  (Tr. 681).  Smith
denied any other symptoms.  (Tr. 681).

### 2.     Mental Health Records

On June 4, 2018, Smith saw Cassandra Klein, LSW, for a psychological examination. (Tr. 552-57).  Smith told Klein that he had become more depressed after losing people as he grew older and thought about life and death.  (Tr. 552).  Smith first used marijuana, cocaine, and heroin at 10 years old.  (Tr. 554).  His father was a heroin addict who shot himself 25 years earlier, and his mother was a crack addict and alcoholic.  (Tr. 554).  Smith reported that he had seen other people get stabbed, beat up, shot, and murdered.  (Tr. 553).  He said that he'd tried to harm others to get what he wanted or needed, and he had tried hanging himself off a bridge. (Tr. 553).  And he'd spent 15 years in prison for burglary, possession of drugs, armed robbery, drug abuse, and theft.  (Tr. 554).  Smith said he was hospitalized twice (possibly for mental health or for detox), but he was never diagnosed with mental health illness.  (Tr. 553, 555). Klein diagnosed Smith with a single episode of major depressive disorder and admitted him for coping skills counseling.  (Tr. 556-57).

On June 18, 2018, Smith saw James Ward, CNP, for a psychological evaluation. (Tr. 667).  Smith told Ward that he was drug free, but he was depressed because he had no income.  (Tr. 667).  Smith also reported more thoughts of death and his legacy.  (Tr. 667).  He said that he self-isolated at home, avoided the streets for fear of "running into some problems with others," and lost interest in social activities.  (Tr. 667).  Ward diagnosed Smith with unspecified depressive disorder and referred him for counseling.  (Tr. 670-71).  At counseling sessions on October 17 and December 28, 2018, Smith reported that that he was "holding up good" and "feeling okay" coping with the loss of his brother.  (Tr. 686, 689).  Ward noted that Smith had a cooperative and engaged demeanor; goal-directed, linear, and coherent thought

process; no abnormal thought content; depressed mood; flat and constricted affect; calm

behavior; intact cognition; good insight; and no impairment in judgment.  (Tr. 687, 690).

### C.    Relevant Opinion Evidence

#### 1.    Consultative Examiner – Mehdi Saghafi, MD

On April 27, 2010, Mehdi Saghafi, MD, conducted a consultative examination to

evaluate Smith's physical condition.  (Tr. 336-45).  Smith told Dr. Saghafi that he got frostbite

on two toes when he was homeless in 1993, had his toes amputated, and had pain since.

(Tr. 337).  Examination showed no pain in his joints, muscle wasting, or flexion contractures.

(Tr. 339).  There was no deformity or muscle spasms in his back.  (Tr. 340).  There was no

evidence of amputation neuroma in his feet.  (Tr. 340).  Based on his evaluation, Dr. Saghafi

determined that Smith could sit, stand, and walk for 6-8 hours per day.  (Tr. 341).  He did not

need an ambulatory aid.  (Tr. 341).  He could lift and carry 30-40 pounds frequently and 41-100

pounds occasionally.  (Tr. 341).  He could push, pull, manipulate objects, and operate hand/foot

controls.  (Tr. 341).  And he could drive a car and travel.  (Tr. 341).  A checklist attached to

Dr. Saghafi's opinion indicated that Smith had full range of motion in all upper and lower

extremities, and he had normal grasp, manipulation, pinch, and fine coordination bilaterally.

(Tr. 342-45).  Dr. Saghafi also opined that Smith had normal speech, hearing, memory,

orientation, and attention.  (Tr. 341).

#### 2.    David House, Ph.D.

On August 13, 2010, David House, Ph.D., conducted a consultative evaluation to assess

Smith's psychological condition.  (Tr. 347-53).  Smith told Dr. House that he got a long with his

siblings okay and he had an adequate relationship with his son.  (Tr. 348).  Smith said that he

was an "ongoing crack cocaine user," but he had stopped using heroin "years ago."  (Tr. 348).

Smith said he was admitted to Cleveland Psychiatric Institute for 30 days in 2005, but he denied ever being prescribed psychotropic medication.  (Tr. 348).  Smith also indicated that he was concerned only about his physical ability.  (Tr. 349).  On examination, Smith had clear speech content without any loose associations or tangents; he had adequate eye contact; he denied nightmares; he said he slept "pretty good"; and he denied anxiety or phobias.  (Tr. 349).  Smith was not paranoid, delusional, or grandiose.  (Tr. 350).  He denied ideas of reference, thoughts of external control, or thought insertions.  (Tr. 350).  He was fully oriented, had unlimited concentration/attention, appeared to have average intelligence, and had average memory. (Tr. 350).  Smith appeared to have limited insight and judgment.  (Tr. 350).

Dr. House opined that Smith had unlimited ability to: (1) maintain attention, concentration, persistence, and pace to perform simple repetitive tasks; and (2) understand, remember, and follow directions.  (Tr. 351).  Dr. House said that Smith had marked limitations in: (1) withstanding stress and pressure associated with day to day work activity; (2) relating to others and dealing with the general public, fellow workers, and supervisors; (3) adapting; and (4) insight and judgment.  (Tr. 352).

### 3.    Jorethia Chuck, Ph.D.

On April 25, 2018, Jorethia Chuck, Ph.D., conducted a consultative evaluation to assess Smith's psychological condition.  (Tr. 542-49).  Smith told Dr. Chuck that he'd been diagnosed with depression.  (Tr. 543).  Smith said that he had a good relationship with his brothers, wife, and children.  (Tr. 544).  He said he was a "home body" because he preferred to sit at home, watch TV, and mind his own business, but he shot pool from time to time.  (Tr. 544).  Smith said that he was "pretty good at being diplomatic," he "handle[d] pressure very well," he got along

with his past coworkers, and he got along with his supervisor until he was injured and began

litigation.  (Tr. 545).

On examination, Smith was pleasant and well-mannered.  (Tr. 546).  He was not

paranoid, suspicious, or evasive.  (Tr. 546).  He had good posture, sat straight in the chair, had a

normal gait at a normal pace, and smiled appropriately.  (Tr. 546).  Smith had adequate

expressive and receptive language skills, coherent and goal directed thought processes, and a

tense, but calm mood.  (Tr. 546).  Smith did not report or display any anxiety.  (Tr. 546).  He was

fully oriented, was able to perform recent and remote memory tasks, and appeared to have low

average intelligence.  (Tr. 546).  He also had fair judgment and insight.  (Tr. 546).

Dr. Chuck opined that Smith had low average cognitive functioning that could limit his

ability to remember instructions, but he would not have problems in understanding.  (Tr. 547).

Dr. Chuck said that Smith did not appear capable of maintaining attention and concentration and

was unable to do memory tasks, but he would be able to do one-step simple tasks.  (Tr. 547).

Dr. Chuck said that Smith was able to get along with coworkers and supervisors, and he should

be able to respond appropriately to supervision.  (Tr. 548).  Dr. Chuck said that Smith had an

impairment in handling stress and work pressure, but she did not explain the degree of such an

impairment.  (Tr. 548).

### 4.       State Agency Consultants

On May 3, 2018, state medical consultant Leigh Thomas, MD, evaluated Smith's

physical function based on a review of the medical record.  (Tr. 83-84).  Dr. Thomas determined

that Smith could lift or carry up to 20 pounds occasionally and 10 pounds frequently; stand

and/or walk for up to 6 hours in an 8-hour day; sit up to 6 hours in an 8-hour day; and push/pull

without limitation.  (Tr. 83).  Smith could never climb ladders/ropes/scaffolds.  (Tr. 83).  He

could frequently climb ramps/stairs and crawl.  (Tr. 83-84).  And he was unlimited in balancing, stooping, kneeling, and crouching.  (Tr. 83-84).  Smith had no manipulative, visual, communicative, or environmental limitations.  (Tr. 84).  On August 9, 2018, Steve E. McKee, MD, concurred with Dr. Thomas's assessment, except that he opined Smith could lift and carry up to 50 pounds occasionally and 25 pounds frequently.  (Tr. 125-27).  Both Dr. Thomas and Dr. McKee noted that Smith had toes amputated due to frostbite, but his gait remained normal. (Tr. 84, 127).

On May 2, 2018, state psychological consultant Mary K. Hill, Ph.D., evaluated Smith's mental health function based on a review of the medical record.  (Tr. 80).  Dr. Hill determined that Smith had mild limitations in understanding, remembering, or applying information; interacting with others; concentrating, persisting, and maintaining pace; and adapting or managing himself.  (Tr. 80).  But Smith's psychological symptoms did not interfere with his daily living activities and they were not severe.  (Tr. 80).  On July 28, 2018, Irma Johnston, Psy.D., concurred with Dr. Hill's assessment.  (Tr. 122).

### D.    Relevant Testimonial Evidence

Smith testified at the ALJ hearing.  (Tr. 36-55).  Smith said that he spent most of his time at home watching game shows.  (Tr. 46).  He said that his wife did the household chores and grocery shopped.  (Tr. 46).  Smith said he didn't have any hobbies other than watching basketball, and that he'd stopped volunteering work because it was too physical.  (Tr. 46).  Smith said that he couldn't work because he had phantom pain from his toe amputations, and he said that he was awaiting heart surgery.  (Tr. 47-48).  He also said that he didn't feel "equipped at this present time to deal with the public" because he felt overwhelmed and didn't "need to have the public seeing [him] like that as a man."  (Tr. 48).  Smith explained that he was seeing a grief

counselor, and that he'd had a hard time dealing with the death of five people who were close to him in the previous year.  (Tr. 48-49, 53-55).  Smith said that he was in a drug treatment program, and he last used crack cocaine 120 days before the ALJ hearing.  (Tr. 49-50).

Smith said that when he worked as a car washer, he might have lifted around 20 pounds while moving water.  (Tr. 38).  As a dishwasher, he spent about four hours on his feet, but he also had a stool to sit on and never had to lift anything over 10 pounds because coworkers would bring dishes to his station.  (Tr. 40-41).  When he was a machine operator, he was on his feet most of the time, but he didn't have to lift more than 10 pounds.  (Tr. 41-42).  As a residential monitor, Smith worked at a front desk, occasionally made 15-minute rounds to check on people at the shelter, checked people in, assigned beds, and called the police if anyone at the shelter was causing problems.  (Tr. 43-45, 52).

Daniel Simoni, a vocational expert ("VE") also testified at the ALJ hearing.  (Tr. 55-67). The ALJ asked the VE whether a hypothetical individual with Smith's age, experience, and education could work if he were limited to light exertion, except that he could "frequently climb ramps and stars, never ladders, ropes or scaffolds, and frequently crawl."  (Tr. 59).  The VE said that such an individual could perform all of Smith's past work as performed and as typically performed.  (Tr. 60).  The ALJ asked if the individual identified in the first hypothetical could work if he were also limited to "no strict production rate pace requirements and can tolerate only occasional interactions with supervisors, coworkers, and the public."  (Tr. 60-61) (clarifying that "strict production rate" meant assembly line work).  The VE said that the residential monitor, machine operator, or automobile detailer jobs would be precluded, but such an individual could perform Smith's past work as a kitchen helper.  (Tr. 61-62).

On cross-examination, Smith's attorney noted that Smith testified he regularly interacted with coworkers in his kitchen helper job because they were giving him extra assistance (lifting items for him).  (Tr. 62).  Smith testified that the only time he wasn't interacting with coworkers was when his work exceeded closing time, and everyone else had left for the day.  (Tr. 62). Smith explained that everyone in the kitchen was close together, and people were regularly in an out to place orders.  (Tr. 63).  He said that the only times he didn't interact with coworkers before closing were the times he felt overwhelmed.  (Tr. 63).  And he said he was overwhelmed "[t]he whole time [he] was there."  (Tr. 63).  The VE said that Smith's clarification testimony didn't change his mind because Smith had not actually described "interaction."  (Tr. 64).  The VE explained that Smith had said he was just around people, who were bringing him items and walking away, but "interaction" involved doing an activity, talking to, or working in tandem with someone else.  (Tr. 64).  Smith said that he had a "catch man," with whom he worked in tandem to break down the machine, change out cleaning chemicals together, and ensure dishes were being removed from the machine when new dishes were being put in.  (Tr. 65-66).  The VE indicated that such work would be precluded by the ALJ's second hypothetical.  (Tr. 66-67).

## III.    The ALJ's Decision

On June 25, 2019, the ALJ issued a written decision denying Smith's claims.  (Tr. 12-23). The ALJ made the following paraphrased findings relevant to what appear to be Smith's claims on judicial review:

> 3.  Smith had the severe impairments of: inguinal hernia; dysfunction of major joints; toe amputations (from frostbite).  The presence of an obese body habitus here did not support a greater degree of functional limitation than Smith would have otherwise exhibited.  The longitudinal record failed to support a finding that Smith had a severe physical impairment or combination of impairments causing a limitation or restriction having more than a minimal effect on his ability to do basic work activities.  Obesity was a factor that was considered in limiting Smith to less than the full range of light work due to some references to his body habitus

12

in the record and pursuant to SSR l 9-2p.  The ALJ considered all of Smith's medically determinable impairments, including those that are not severe, when assessing Smith's residual functional capacity.  And Smith's mental impairments were not severe because he had only mild limitation in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing himself.  (Tr. 14-16).

4.  Smith did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.  Smith had the residual functional capacity to perform light work, except lifting and/or carrying 20 pounds occasionally and 10 pounds frequently; sitting for 6 hours in an 8-hour workday, walking for 6 hours in an 8-hour workday, and standing for 6 hours in an 8-hour workday; push/pull as much as lift/carry; frequently climb ramps and stairs but never climb ladders, ropes or scaffolds; frequently crawl.  The ALJ "considered all symptoms" in light of the medical and other evidence.  Smith's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, Smith's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence.  (Tr. 17-18).

With regard to Smith's toe amputations, the evidence showed that Smith had five toes removed due to frost bite.  Records showed that he received injections for pain, which helped.  And in October 2018, he received orthotics, which greatly reduced his pain.  Nevertheless, he was limited in his ability to climb and crawl. (Tr. 19-20).

The ALJ found Dr. Thomas's, Dr. McKee's, Dr. Hill's, and Dr. Johnston's opinions persuasive because they were consistent with the record.  Specifically, nothing in Smith's mental health records suggested more than mild problems interacting with others, understanding information, concentrating, or adapting and managing himself.  The ALJ was not persuaded by Dr. Saghafi's or Dr. House's opinions because they were issued seven years before the alleged onset date and were not representative of Smith's physical capabilities during the relevant period, but they were considered as a historical perspective of Smith's condition. The ALJ did not find Dr. Chuck's opinion persuasive because it represented Smith's functioning on only one day, was not indicative of Smith's long-term functioning, and was inconsistent with both objective medical evidence in the record and Smith's assertions at the hearing.  (Tr. 20-21).

Based on the ALJ's findings – and the VE's testimony that an individual with Smith's

RFC and other characteristics could perform all of Smith's past work – the ALJ

determined that Smith was able to perform his past work as a production machine tender,

hospital admitting clerk, automobile detailer, kitchen helper, and receptionist.  (Tr. 22).
And, because Smith could perform his past work, the ALJ determined that he was not
disabled from July 13, 2017, through the date of his decision.  (Tr. 23).

## IV.    Law & Analysis

### A.    Standard of Review

The court reviews the Commissioner's final decision to determine whether it was
supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C.
§§ 405(g), 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).
"Substantial evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct.
1148, 1154 (2019).  "It means – and means only – 'such relevant evidence as a reasonable mind
might accept as adequate to support a conclusion.'"  *Id.* (quoting *Consolidated Edison Co. v.
NLRB*, 305 U.S. 197, 229 (1938)).  Even if a preponderance of the evidence supports the
claimant's position, the Commissioner's decision still cannot be overturned "'so long as
substantial evidence also supports the conclusion reached by the ALJ.'"  *O'Brien v. Comm'r of
Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. Aug 7, 2020) (quoting *Jones v. Comm'r of Soc. Sec.*,
336 F.3d 469, 477 (6th Cir. 2003)).  Under this standard, the court cannot decide the facts anew,
evaluate credibility, or re-weigh the evidence.  *Jones*, 336 F.3d at 476.  And "it is not necessary
that this court agree with the Commissioner's finding," so long as it meets this low standard for
evidentiary support.  *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783 ("It is not our
role to try the case de novo." (quotation omitted)).  This is so because the Commissioner enjoys a
"zone of choice" within which to decide cases without being second-guessed by a court.  *Mullen
v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court would not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error.").  Furthermore, the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform his past relevant work in light of his RFC; and (5) if not, whether, based on the

claimant's age, education, and work experience, he can perform other work found in the national economy.  20 C.F.R. § 404.1520(a)(4)(i)-(v)[2]; *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006).  Although it is the Commissioner's obligation to produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that he is disabled and, thus, entitled to benefits.  20 C.F.R. § 404.1512(a).

### B.    Step Two: Obesity and Depression as Severe Impairments[3]

In the first four paragraphs of his first argument section, Smith asserts that the ALJ erred by not finding that his obesity and depression were "severe impairments."  ECF Doc. 14 at 9-11. Smith appears to assert that his obesity was a "severe impairment" because it affected his ability to stand and walk.  ECF Doc. 14 at 10.  And he appears to assert that his depression was a "severe impairment" because it affected his ability to perform simple tasks, affected his ability to adjust to work pressures, and caused him to lose interest in activities and self-isolate.  ECF Doc. 14 at 10-11.  Further, Smith appears to assert that any error in not finding his obesity and depression "severe" at Step Two was not harmless because the ALJ didn't consider the combined impacts of all his impairments and a severity finding at Step Two would have resulted in a more-restrictive RFC.  ECF Doc. 14 at 10-12.

---

[2] The regulations governing DIB claims are found in 20 C.F.R. § 404, *et seq.* and the regulations governing SSI claims are found in 20 C.F.R. § 416, *et seq.*  Generally, these regulations are duplicates and establish the same analytical framework.  For ease of analysis, this R&R will cite only to the relevant regulations in 20 C.F.R. § 404, *et seq.* unless there is a relevant difference in the regulations.

[3] For ease of analysis, the disparate arguments scattered across the first argument subjections in Smith's merits brief are reorganized in this R&R to fit within the five-step analytical framework for Social Security cases.  Any arguments that might be lost in the distillate are forfeited for insufficient articulation. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."); *Emerson v. Novartis Pharms. Corp.*, 446 F. App'x 733, 736 (6th Cir. 2011) (agreeing with the Seventh Circuit that judges are not truffle-hunting pigs); *see also Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985) (Even when an unrepresented litigant is entitled to liberal construction, judges are not transformed into "mind readers[ and] they cannot be expected to construct full blown claims from sentence fragments.").

The Commissioner responds that the ALJ properly determined that Smith's obesity and depression were not "severe impairments" at Step Two and that. ECF Doc. 15 at 11-14.  Further, the Commissioner asserts that the ALJ considered the effects of Smith's obesity, toe amputations, and depression at other steps in the sequential evaluation. ECF Doc. 15 at 11-14.

In his reply brief, Smith argues that the ALJ's RFC finding was not evidence supporting the conclusion that his obesity was not a severe impairment. ECF Doc. 16 at 1-2.  Smith also contends that the ALJ's conclusion that his depression was not a "severe impairment" wasn't supported by substantial evidence because there was evidence in the record that could have supported a finding that his depression was a "severe impairment." ECF Doc. 16 at 2.

At Step Two, a claimant has the burden to show that he has *at least one* "severe impairment." 20 C.F.R. § 404.1520(a)(4)(ii), (c).  A "severe impairment" is a medical condition that has more than minimal effect on mental or physical function and is expected to last for 12 months or cause death. 20 C.F.R. §§ 404.1509, 404.1522; *Salmi v. Sec'y of Health & Human Servs.*, 744 F.2d 685, 691 (6th Cir. 1985).  This is a threshold inquiry "intended to 'screen out totally groundless claims.'" *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576 (6th Cir. 2009) (quoting *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985)).  If the claimant doesn't show he has *at least one* "severe" impairment, she's categorically *not* disabled. 20 C.F.R. § 404.1520(c).  If he does satisfy this minimal burden, the ALJ has to consider *all his impairments* (even ones that aren't "severe") at the remaining steps in the sequential evaluation.  *Nejat*, 359 F. App'x at 577 (quoting SSR 96-8p, 1996 SSR LEXIS 5 (Jul. 2, 1996)).  And, so long as the ALJ considers all the claimant's impairments in the other steps, any Step Two error is harmless.  *Nejat*, 359 F. App'x at 577 (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)).

Even if we agreed with Smith that the ALJ should have found his obesity and depression were "severe impairments" – and maybe we should agree[4] – the ALJ's failure to do so is harmless.  *Nejat*, 359 F. App'x at 576-77.  This is because the ALJ considered Smith's obesity and depression in later steps in the sequential analysis.  *Id.*; *see also* (Tr. 15-22).  Specifically, the ALJ noted that Smith's obesity was a factor that he found supported limiting his RFC to a limited range of light work at Step Four.  (Tr. 15, 17-18).  And the ALJ expressly indicated that the four-domain analysis he conducted at Step Two (which evaluated the same paragraph "B" listings criteria considered for mental health impairments at Step Three, *see* 20 C.F.R. pt. 404, Subpt. P, App. 1) reflected his findings at Steps Three, Four, and Five.  (Tr. 16-17).  Thus, because the ALJ considered Smith's obesity and depression (and all other symptoms) at later steps in the sequential evaluation process, any Step Two error was harmless.  *Nejat*, 359 F. App'x at 576-77; *Rabbers*, 582 F.3d at 654.

Accordingly, Smith cannot show that any Step Two error justifies a remand or vacatur of the ALJ's decision.

### C.    Step Three: Failure to Consider an Unidentified Listing

In the fifth paragraph of his first argument section, Smith states:

The ALJ claimed that he considered Listings 1.02, 1.04, and 1.05 (Tr. 17).  Since Plaintiff did not satisfy each of the elements of the Listings.  The ALJ acknowledged that Plaintiff had five of his ten toes amputated, but since it was not amputation above the tarsal region, the Listing was not considered.  The ALJ failed to consider the effects of the amputation on Plaintiff's ability to stand and/or walk for six hours per day.  As such, his RFC finding was not supported by substantial evidence and should be remanded.

[4] Although concluding that Smith's obesity didn't cause "a greater degree of functional limitation" than his other impairments and that "evidence does not *otherwise* indicate that there is more than a minimal limitation" as a result of his mental impairments, the ALJ acknowledged that: (1) Smith's obesity was a factor reducing his exertional ability to a range of light work; and (2) his depression (and other mental health symptoms) caused mild limitations across all four domains of mental function.  (Tr. 15-16).  Those findings are possibly incongruent with the conclusion that Smith's obesity and depression didn't have "more than minimal effect."  20 C.F.R. §§ 404.1509, 404.1522; *Salmi*, 744 F.2d at 691.

ECF Doc. 14 at 11.[5]  It makes sense to read this paragraph as a challenge to the ALJ's Step Three finding insofar as Smith says, "the Listing was not considered." ECF Doc. 14 at 11.  But what listing wasn't considered and why was that error?  Smith doesn't say.

Smith says that the ALJ *considered* Listing 1.02 (dysfunction of a joint), Listing 1.04 (spine disorders), and Listing 1.05 (amputation). ECF Doc. 14 at 11.  That's true.  (Tr. 17) (expressly considering Listings 1.02, 1.04, and 1.05).  Smith also appears to *acknowledge* that he didn't meet any of those listings.  *See* ECF Doc. 14 at 11 ("Since Plaintiff did not satisfy each of the elements of the Listings.").  The ALJ agreed.  (Tr. 17).  And Smith specifically notes that his toe amputation didn't even warrant consideration of Listing 1.05 (amputation) because his toe amputation wasn't above the tarsal region. ECF Doc. 14 at 11; *see also* 20 C.F.R. pt. 404, Subpt. P, App. 1 § 1.05(B), (C) (requiring foot amputations to be above the tarsal region to qualify as a disabling amputation); *Sheeks v. Comm'r of SSA*, 544 F. App'x 639, 641 (6th Cir. 2013) (The ALJ "need not discuss listings that the [claimant] clearly does not meet.").  But the ALJ did consider Listing 1.05 and explained that the amputation of five of Smith's toes didn't meet criteria because toes aren't "at or above the tarsal region."[6]  (Tr. 17); *see also* 20 C.F.R. pt. 404, Subpt. P, App. 1 § 1.05(B), (C).

Smith has not identified any other listing that he thinks the ALJ should have considered, explained what the requirements of any such listing would have been, explained what conditions he believes might have met a listing, or alleged that the ALJ failed to adequately explain why his

---

[5] To the extent the last two sentences of the quoted paragraph challenge the ALJ's RFC finding, I will consider that part of Smith's argument in the next sub-section of this R&R, which deals with the ALJ's ultimate RFC finding.

[6] To the extent Smith might be asserting that the ALJ erred by *considering* Listing 1.05, that error is harmless at best because Smith could only have benefitted from the ALJ considering whether he was categorically disabled.  *Rabbers*, 582 F.3d at 654 (an error is harmless if it didn't prejudice the claimant).

conditions didn't meet or medically equal any of the listings.  *See generally* ECF Doc. 14 at 11;
*see also Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) (describing an
ALJ's duty to explain his findings at Step Two).  The striking legal and factual emptiness of
Smith's discussion of the ALJ's Step Three findings leaves any challenge to the ALJ's Step
Three findings forfeited.  *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)
("'Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed
argumentation, are deemed [forfeited].  It is not sufficient for a party to mention a possible
argument in the most skeletal way, leaving the court to . . . put flesh on its bones.' *Citizens
Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 239-94 (1st
Cir. 1995) (citation omitted)." (omission in original)).

    Accordingly, this portion of Smith's argument has not satisfied Smith's burden to show
that the ALJ failed to apply proper legal standards and reach a decision supported by substantial
evidence.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers*, 486 F.3d at 241.

> **D.    Step Four: Obesity, Standing/Walking, and Light Work**

    Throughout his the first argument section of his brief, Smith makes various statements
that the RFC finding was not supported by substantial evidence because the ALJ failed to
adequately consider that his obesity and toe-amputations prevented him from performing the
walking and standing requirements of light work.  *See* ECF Doc. 14 at 10-11 (¶¶3, 5, 10).  The
Commissioner disagrees.  ECF Doc. ECF Doc. 15 at 12.

    In his reply brief, Smith argues that "the ALJ committed harmful error when he failed to
include in the RFC the limitations regarding Plaintiff's limitation to only occasional interaction
with others and that he could stand/walk the requisite 6 hours for performing work at the light
level of exertion."  ECF Doc. 16 at 4.

20

As a preliminary matter, Smith's attempt to raise a new argument – that the ALJ failed to adequately consider his depression in evaluating his RFC at Step Four – in his reply brief is unavailing.  That's because issues raised for the first time in reply briefs are forfeited.  *Colvin v. Comm'r of Soc. Sec.*, No. 4:18-cv-1249, 2019 U.S. Dist. LEXIS 168743, at *11 (N.D. Ohio Sept. 30, 2019) ("Plaintiff's attempts to more fully develop [his] argument in his reply brief comes too late, as it is well-established that new substantive issues cannot be raised in a reply brief."); *see also Bose v. Bea*, 947 F.3d 983, 993 (6th Cir., Jan 28, 2020) (holding that "any attempt to develop" an argument in a reply brief "was too late").

In any event, the ALJ applied proper legal standards and reached a decision supported by substantial evidence in determining Smith's RFC.  The Step Four RFC assessment is an evaluation of a claimant's ability to do work despite his impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)); 20 C.F.R. § 404.1520(e).  "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96-8p, 1996 SSR LEXIS 5.  Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant.  20 C.F.R. § 404.1529(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. § 404.1520(e).  The RFC is an assessment of a claimant's ability to do work despite his impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"

21

SSR 96-8p, 1996 SSR LEXIS 5.  Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. § 404.1529(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

An ALJ must consider the claimant's obesity when determining his RFC.  SSR 02-1p, 2002 SSR LEXIS 1 (Sept. 1, 2002)[7]; *see also* SSR 19-2p, 2019 SSR LEXIS 2 (May 20, 2019). This is because obesity could limit a claimant's exertion, posture, manipulation, and ability to sustain movement.  SSR 02-1p, 2002 SSR LEXIS 1, at *16-17; SSR 19-2p, 2019 SSR LEXIS 2, at *12-13.  It could also affect the claimant's mental clarity and fatigue.  SSR 02-1p, 2002 SSR LEXIS 1, at *16-17; SSR 19-2p, 2019 SSR LEXIS 2, at *12-13.

The ALJ properly evaluated Smith's obesity and depression when  determining his RFC. 42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers*, 486 F.3d at 241.  The ALJ complied with the regulations by considering *all of Smith's symptoms*, including his obesity, amputations/phantom pain, and mental health symptoms despite having found them non-severe.  (Tr. 15-16, 18-21). The ALJ specifically discussed each of Smith's relevant impairments and evidence of those impairments in explaining why he did not find that the evidence supported greater limitations than those in his RFC finding.  (Tr. 15-16, 17-21).  In doing so, the ALJ specifically said that his discussion of evidence concerning Smith's obesity and depression in Section 3 of his written decision was considered in making his Step Four findings.  (Tr. 15-16).

---

[7] SSR 02-1p was rescinded effective May 20, 2019 and replaced with SSR 19-2p.  Because Smith's claim was filed before May 20, 2019, the ALJ might have technically erred by applying SSR 19-2p – unless SSR 19-2p was retroactive.  *See* (Tr. 15) (applying SSR 19-2p).  Luckily, the court need not decide that matter because: (1) Smith has not raised the issue, *see Swain v. Comm'r of Soc. Sec.*, 379 F. App'x 512, 517 (6th Cir. 2010) (issues not raised are forfeited); and (2) SSR 02-1p and SSR 19-2p are generally the same with regard to how an ALJ should consider obesity at Step Four, *Compare* SSR 02-1p, 2002 SSR LEXIS 1, at *16-17, *with* SSR 19-2p, 2019 SSR LEXIS 2, at *12-13.

Substantial evidence also supported the ALJ's decision not to include greater standing/walking and interaction limitations in the RFC.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers*, 486 F.3d at 241.  Such evidence includes:

(1) regular findings that Smith had a full range of motion and strength in his extremities, appeared well, had a normal gait, denied pain in his lower extremities, and had intact sensation, (Tr. 364, 371, 377-78, 381, 384-86, 397, 411, 402-09, 563-64, 569-70, 614-21, 631, 637-38, 643-45, 648-49, 653-54);

(2) Smith's treatment statements that denied difficulty walking and stated that injections and orthotics relieved his phantom pain, (Tr. 563, 569-70, 681, 683);

(5) Dr. Reid's, Dr. Li's, and nurse Dahodwala's notes indicating that Smith was cooperative, had a normal mood, and had a normal mental status, (Tr. 384, 397, 402-09, 614-21);

(4) Ward's examination findings that Smith was cooperative and had an engaged demeanor, coherent thought process, calm behavior, intact cognition, good insight, and unimpaired judgment, (Tr. 687, 690);

(5) Smith's statements to Ward that he was "holding up good" and "feeling okay" dealing with his grief after counseling, (Tr. 686, 689);

(6) Smith's statements to Dr. Chuck that he had a good relationship with his family, was good at being diplomatic, handled pressure very well, and got along with coworkers and supervisors, (Tr. 544-45);

(7) Dr. Chuck's examination notes indicating that Smith was pleasant and well-mannered and opinion that Smith could get along with coworkers and respond well to supervision, (Tr. 546, 548);

(8) the Dr. Hill's and Dr. Johnston's opinions that Smith's mental condition didn't affect his functioning, (Tr. 80, 122); and

(9) Dr. Thomas's and Dr. McKee's opinions that Smith could stand/walk for up to 6 hours in an 8-hour day (Tr. 83-84, 125-27).

*See also Biestek*, 139 S. Ct. at 1154.  Even if other evidence could have supported greater restrictions, the ALJ was free to weigh the evidence the way he did.  *See O'Brien*, 819 F. App'x at 416; *Jones*, 336 F.3d at 477.  And, because the ALJ's decision not to include in the RFC greater limitations in Smith's ability to stand/walk and interact was supported by substantial

evidence, the ALJ's decision fell within the commissioner's "zone of choice" and cannot be second-guessed by this court.  *Mullen*, 800 F.2d at 545.

Thus, Smith has failed to show that the ALJ's decision not to include greater RFC limitations based on his obesity and depression was the result of a failure to apply proper legal standard s or unsupported by substantial evidence.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers*, 486 F.3d at 241.

### E.        Step Four: Weighing of Medical Opinion Evidence

In the seventh through ninth paragraphs of his first argument section, Smith challenges the ALJ's treatment of Dr. Saghafi's, Dr. House's, and Dr. Chuck's opinions.  ECF Doc. 14 at 12-13 (¶¶ 7-9).  Specifically, Smith argues that the ALJ improperly "ignored" these opinions, and instead considered only evidence that supported his own RFC opinion (*i.e.*, "cherry-picked" evidence).  ECF Doc. 14 at 12-13.  Further, Smith appears to argue that the Sixth Circuit's decision in *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013), *required* the ALJ to give Dr. Saghafi's, Dr. House's, and Dr. Chuck's opinions greater weight than he gave to the state agency consultants' opinions.  ECF Doc. 14 at 13.  The Commissioner disagrees.  ECF Doc. 14 at 13-17.

In apparent contradiction to his initial brief's assertion that the ALJ "ignored" Dr. Saghafi's, Dr. House's, and Dr. Chuck's opinions, Smith's reply brief asserts that the ALJ: (1) explained that Dr. Saghafi's and Dr. House's opinions were not persuasive because they were from 2010 and did not represent Smith's condition during the relevant period; and (2) determined that Dr. Chuck's opinion wasn't persuasive; but (3) failed to provide a "coherent explanation for his reasoning."  ECF Doc. 16 at 3.  Smith's reply also acknowledges that the March 2017 amendments to the regulations disposed of: (1) the physician hierarchy from *Gayheart* that he

had relied upon in his initial brief; and (2) the assignment of particular "weight" to medical

opinions.  ECF Doc. 16 at 3.[8]

The Step Four requirement for an ALJ to consider all the evidence, includes a

requirement to weigh medical opinions.  20 C.F.R. § 404.1520(e).  On January 18, 2017, the

Social Security Administration amended the rules for evaluating medical opinions for claims

filed after March 27, 2017.  *See Revisions to Rules Regarding the Evaluation of Medical*

*Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017).  The new regulations provide that the Social

Security Administration "will not defer or give any specific evidentiary weight, including

controlling weight, to any medical opinion(s) or prior administrative medical finding(s)."  20

C.F.R. § 404.1520c(a).  Nevertheless, an ALJ must "articulate how [she] considered the medical

opinions and prior administrative medical findings" in adjudicating a claim.  20 C.F.R.

§ 404.1520c(a).  In doing so, the ALJ is required to explain how she considered the

supportability and consistency of a source's medical opinion(s), but generally is not required to

discuss other factors.  20 C.F.R. § 404.1520c(b)(2).  If the ALJ finds that two or more medical

opinions "are both *equally well-supported and consistent* with the record but are not exactly the

same," the ALJ must articulate what factors were most persuasive in differentiating the opinions.

20 C.F.R. § 404.1520c(b)(3) (internal citations omitted) (emphasis added).  Other factors

include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the

client; (2) the source's specialization; and (3) "other factors," such as familiarity with the

---

[8] Smith also appears to raise – for the first time in his reply brief – a new argument that the ALJ improperly relied upon the state agency consultants' opinions because: (1) the opinions were issued in May and April 2018; and (2) the state agency consultants, therefore, didn't have an opportunity to review *all* the evidence in the record.  ECF Doc. 16 at 3.  But, as discussed at page 21 above, new arguments can't be raised in a reply brief.  And, even if not forfeited, this argument would fail because the existence of after-opinion evidence doesn't preclude an ALJ's reliance on state agency consultants' opinions so long as *the ALJ* considered the record as a whole.  *McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009); *see* (Tr. 14-22) (ALJ decision reflecting consideration of the whole record).

disability program and other evidence in the record.  20 C.F.R. § 404.1520c(c)(3)-(5).

Consistency concerns the degree to which the opinion reflects the same limitations described in

evidence from other sources, whereas supportability concerns the relevancy of objective medical

evidence and degree of explanation given by the medical source to support the limitations

assessed in the opinion.  *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

The ALJ applied proper legal standards and reached a decision supported by substantial

evidence in evaluating Dr. Saghafi's, Dr. House's, and Dr. Chuck's opinions.  42 U.S.C.

§§ 405(g), 1383(c)(3); *Rogers*, 486 F.3d at 241.  The ALJ complied with the regulations when he

explained that he: (1) did not give any particular weight to any medical source opinions;

(2) found Dr. Saghafi's and Dr. House's opinions unpersuasive because they predated the

relevant period by seven years and didn't reflect Smith's condition during the relevant period;

and (3) found Dr. Chuck's opinion inconsistent with other evidence in the record.  (Tr. 20-21).

The three opinions' inconsistency with Smith's objective medical records and other evidence

during the relevant period, as well as the extreme remoteness of Dr. Saghafi's and Dr. House's

opinions, were acceptable bases upon which to discount those opinions.  *See* 20 C.F.R.

§ 404.1520c(c)(1)-(2); *see also Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d 1155, 1165 (9th Cir.

2008) ("Medical opinions that predate the alleged onset of disability are of limited relevance.");

*Hill v. Comm'r of Soc. Sec.*, No. 17-10089, 2018 U.S. Dist. LEXIS 44394, at *22-23 (E.D.

Mich., Feb. 27, 2018) (ALJ properly discounted opinion issued 6 months before the alleged onset

date); *Cf. Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535-36 (6th Cir. 2001) (ALJ did not err

by not considering an opinion issued after the relevant period when it was based only on

evidence pre-dating the relevant period).  Further, the evidence that I cited as supporting the

ALJ's RFC determinations in Section III.B.3, above, also supported the ALJ's conclusion that

Dr. Saghafi's and Dr. House's opinions did not reflect Smith's condition during the relevant period and that Dr. Chuck's opinion was not consistent with other evidence in the record. *Biestek,* 139 S. Ct. at 1154; (Tr. 80, 83-84, 122, 125-27, 364, 371, 377-78, 381, 384-86, 397, 402-11, 544-46, 563-64, 569-70, 614-21, 631, 637-38, 643-45, 648-49, 653-54, 681, 683, 686-87, 689-90).

Thus, because the ALJ applied proper legal standards and reasonably drew his conclusions from the record, the ALJ's decision fell within the Commissioner's "zone of choice" and cannot be second-guessed by this court.[9]  *O'Brien,* 819 F. App'x at 416; *Mullen,* 800 F.2d at 545.

### F.    Step Four: Subjective Symptom Complaints

Smith next argues that the ALJ's "credibility" determination violated SSR 16-3p and was not supported by substantial evidence.  ECF Doc. 14 at 14-16.  Smith contends that "the ALJ did not properly evaluate the medical evidence and [did not] make a defensible determination as to whether [his] testimony was credible."  ECF Doc. 14 at 15.  Smith specifically asserts that the ALJ both: (1) acknowledged his testimony regarding phantom pain from his toes, but determined that his testimony concerning the limiting effects of his pain was inconsistent with the objective medical evidence; and (2) "ignore[ed]" his pain allegations.  ECF Doc. 14 at 15-16.  Further, Smith argues that the ALJ's conclusion that his pain didn't limit his ability to stand/walk was not

---

[9] Smith's challenge to the ALJ's treatment of Dr. Saghafi's opinion is also at odds with his general assertions that he couldn't perform a limited range of light work.  *Compare* (Tr. 341-45), *with* ECF Doc. 14.  Dr. Saghafi's opinion – that he could lift up to 40 pounds frequently and 100 pounds occasionally and didn't have any other physical or mental limitation – would have supported a finding that he could perform the full range of *medium work*, if not a reduced range of *heavy work*.  *Compare* (Tr. 341-45), *with* 20 C.F.R. § 404.1567(c)-(d) (defining medium and heavy work).  And such an RFC would have resulted in a finding that Smith was categorically *not disabled* under the Medical-Vocational Guidelines.  *See* 20 C.F.R. pt. 404, Subpt. P § 203.06.  Smith almost certainly wouldn't like for this Court to agree with him that the ALJ erred by failing to credit such an opinion and direct the ALJ to adopt it.

supported by substantial evidence.  *Cf.* ECF Doc. 14 at 16.[10]  The Commissioner disagrees and points out that because Smith did not identify any specific error in the ALJ's analysis, but only made general assertions that the ALJ "ignored" or "failed to properly consider" his pain, any challenge to the ALJ's subjective complaint evaluation is waived.  ECF Doc. 15 at 17.

In his reply brief, Smith argues that Dr. Canales's acknowledgement that he had pain, skin temperature deviations, no pedal hair growth, and diminished light sensation supported his pain complaints.  ECF Doc. 16 at 4.  Thus, he asserts that the ALJ should have determined that his foot pain precluded light work.  ECF Doc. 16 at 4.

A claimant's subjective symptom complaints are among the evidence that an ALJ must consider in assessing a claimant's RFC at Step Four.  *See* 20 C.F.R. §§ 404.1520(e), 416.920(e); *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989) ("Subjective complaints of pain or other symptoms may support a claim of disability.").  Before March 2016, the Social Security Administration characterized the evaluation of a claimant's subjective symptom complaints as a "credibility" determination.  *See* SSR 96-7p, 1996 SSR LEXIS 4 (July 2, 1996).  In SSR 16-3p, the Social Security Administration noted that this characterization did not accurately reflect the language in the regulations and eliminated the term "credibility" from its sub-regulatory policy. SSR 16-3p, 2016 SSR LEXIS 4 (Oct. 25, 2017).  The Social Security Administration explained that "subjective symptom evaluation is not an examination of an individual's character," but is instead an examination of the consistency of the claimant's subjective complaints with other

---

[10] Smith actually says, "[t]he ALJ's failure in this matter to properly consider [his] disabling pain and its limiting effect on his ability to stand and/or walk was not supported by substantial evidence."  ECF Doc. 14 at 16.  A strict translation of that sentence is that "no evidence demonstrates that the ALJ failed to properly consider his disabling pain and its limiting effect on his ability to stand and/or walk."  *See* Richard C. Wydick, PLAIN ENGLISH FOR LAWYERS 27-32 (5th ed. 2005) (explaining how to translate passive voice to active voice).  But Smith surely cannot mean that.  So I've given this statement a liberal translation consistent with the gravamen of Smith's argument as a whole.

evidence in the record.  SSR 16-3p, 2016 SSR LEXIS 4 ("We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence.").

In conducting this *consistency* analysis, an ALJ is not required to accept the claimant's complaints at face value but may discount them based on several factors, including the claimant's daily activities, the nature of the claimant's symptoms, the claimant's efforts to alleviate her symptoms, the type and efficacy of any treatment, and any other factors concerning the claimant's functional limitations and restrictions.  SSR 16-3p, 2016 SSR LEXIS 4 *15-19; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *Jones*, 336 F.3d at 475–76 ("[A]n ALJ is not required to accept a claimant's subjective complaints."); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible).  The ALJ need not exhaustively discuss each of these factors or all of the evidence in the record but need only acknowledge the factors and discuss the evidence that supports his decision.  *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each [factor], so long as he acknowledged and examined those [factors] before discounting a claimant's subjective complaints." (quotation omitted)); *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) ("'[A]n ALJ is not required to discuss all the evidence submitted.'" (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)).

Smith's arguments regarding the ALJ's "credibility" findings are misplaced.  The ALJ did not make *any* findings as to Smith's "credibility."  *See generally* (Tr. 12-23).  And for good reason – the regulations say not to do that.  SSR 16-3p, 2016 SSR LEXIS 4.

The ALJ also didn't "ignore" Smith's subjective complaints, as he asserts.  Instead, as Smith also (inconsistently) asserts, the ALJ explained that he found Smith's subjective complaints (including his phantom toe pain complaints) inconsistent with the objective medical evidence and other evidence in the record.  (Tr. 18-20).  In doing so, the ALJ exhaustively discussed all the evidence in the record.  *See* (Tr. 15-21).  And that's exactly the kind of analysis the regulations direct the ALJ to conduct.  SSR 16-3p, 2016 SSR LEXIS 4 *15-19; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).  The ALJ wasn't required to accept Smith's allegations at face value.  *Jones*, 336 F.3d at 475–76.  Thus, the ALJ applied proper legal standards in evaluating Smith's subjective symptom complaints.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers*, 486 F.3d at 241.

Substantial evidence also supported the ALJ's finding that Smith's subjective complaints about phantom toe pain were inconsistent with the record.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers*, 486 F.3d at 241.  As already discussed above, Smith's treatment notes show that he denied of difficulty walking, denied that he had pain in his lower extremities, said injections and orthotics relieved his phantom pain.  (Tr. 563, 569-70, 681, 683).  Further, medical records from Smith's examinations regularly indicated that he had a full range of motion and strength in his extremities, appeared well, had a normal gait, denied pain in his lower extremities, and had intact sensation.  (Tr. 364, 371, 377-78, 381, 384-86, 397, 411, 402-09, 563-64, 569-70, 614-21, 631, 637-38, 643-45, 648-49, 653-54).  Even if other evidence in the record might have supported a different conclusion regarding the consistency of Smith's subjective complaints, the ALJ's decision fell within the Commissioner's "zone of choice" and cannot be second-guessed by this court.  *O'Brien*, 819 F. App'x at 416; *Mullen*, 800 F.2d at 545.

### G.    Step Four: Past Work Finding

Finally, Smith argues that the ALJ erred by finding that he was able to perform his past

work as a production machine tender, hospital admitting clerk, automobile detailer, kitchen

helper, and receptionist.  ECF Doc. 14 at 16-17.  Smith asserts that, because he had testified that

he didn't believe he was able to perform light work and felt overwhelmed with socialization, the

ALJ should have relied on VE's testimony that such limitations would preclude his past work

and found him disabled.  ECF Doc. 14 at 17.  Further, Smith contends that a finding that he was

limited to sedentary work would have precluded all work under the Medical-Vocational

Guidelines.  ECF Doc. 14 at 17.  The Commissioner disagrees.  ECF Doc. 15 at 18.  Smith's

reply brief reiterates that the Medical-Vocational Guidelines would have directed a "disabled"

finding if he were limited to sedentary work.  ECF Doc. 16 at 4.

At Step Four, the claimant has the burden to establish that he is unable to perform his past

relevant work in light of his RFC.  20 C.F.R. § 404.1520(a)(4)(iv); *see also Wright-Hines v.*

*Comm'r of Soc. Sec.*, 597 F.3d 392, 396 (6th Cir. 2010) (explaining that a claimant challenging a

finding that she was able to perform past relevant work had "fail[ed] to provide [the court] with

the factual record [the court] need[ed] to find in her favor").  In evaluating whether a claimant is

able to perform his past relevant work, an ALJ may rely on VE testimony.  *See Howard v.*

*Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002).  So long as the VE's testimony was

given in response to a hypothetical question that accurately reflected the ALJ's RFC finding, that

testimony is substantial evidence.  *Id.*; *see also Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706,

715 (6th Cir. 2013) (unpublished) (stating that the ALJ's hypothetical question must "accurately

portray[] a claimant's vocational abilities and limitations").  "An ALJ is only required to

incorporate into a hypothetical question those limitations he finds credible." *Lee*, 529 F. App'x at 715.

To the extent Smith uses this claim to reiterate arguments already addressed in previous sections of this order (such as his claims challenging the ALJ's RFC finding), those arguments don't need to be addressed again here.  The ALJ properly found that Smith was able to perform a range of light work.  *See* Section III.B.3., above.

Here, the ALJ applied properly legal standards by relying on the VE's testimony in determining that he was able to perform his past work.  20 C.F.R. § 404.1520(a)(4)(iv); *Howard*, 276 F.3d at 238.  And, because that testimony was given in response to a hypothetical question that accurately reflected the ALJ's ultimate RFC finding, that testimony was substantial evidence to support the ALJ's finding that Smith could perform his past work.  *Compare* (Tr. 17-18), *with* (Tr. 59-60); *Howard*, 276 F.3d at 238.  It doesn't matter that the VE gave testimony regarding other limitations that were not incorporated into the RFC.  *That* testimony was*n't* substantial evidence because it wasn't given in response to a hypothetical question accurately reflecting the ALJ's RFC finding.  *Howard*, 276 F.3d at 238  Moreover, the ALJ wasn't required to incorporate into the RFC limitations that he didn't find supported in the evidence, as discussed in greater detail in Section III.B.3, above.  *Lee*, 529 F. App'x at 715.  And, even if other evidence in the record could have supported a different finding, the ALJ's decision cannot be second-guessed because it was supported by substantial evidence.  *O'Brien*, 819 F. App'x at 416; *Mullen*, 800 F.2d at 545.

## V.    Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Smith's applications for DIB and SSI be AFFIRMED.

Dated: May 28, 2021

Thomas M. Parker
United States Magistrate Judge

_____

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).